CLERK'S OFFICE
A TRUE COPY
Mar 30, 2020
/s/ Daryl Olszewski
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

In the Matter of the Search of:

Facebook username "Rahsheeki Baptiste" - ID # 100023601141180; as more fully described in Attachment A.

)
)
)
)
)
)

Case No.    20-MJ-116

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: 18 U.S.C. 844(i) and 18 U.S.C. 844(n).

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Sworn via telephone; transmitted via email pursuant to Fed. R. Crim. P. 4.1.

ATF SA Rick Hankins
_____
Printed Name and Title

~~Sworn to before me and signed in my presence:~~

Date: March 30, 2020
_____

_____
Judge's signature

City and State: Milwaukee, Wisconsin

William E. Duffin _____, U.S. Magistrate Judge
_____
Printed Name and Title



CLERK'S OFFICE
A TRUE COPY
Mar 30, 2020
/s/ Daryl Olszewski
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Special Agent Rick Hankins, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook, a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.      I am a Special Agent of the United States Justice Department, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), currently assigned to the Milwaukee Field Office. I have been so employed since April 2003. My duties as a Special Agent with ATF include investigating alleged violations of the federal firearms, explosives, and arson statutes.

3.      I have completed approximately 26 weeks of training at the Federal Law Enforcement Training Center (Glynco, Georgia), as well as the ATF National Academy. That training included various legal courses related to Constitutional Law as well as search and seizure authority. Additionally, I have received training on how to conduct various tasks associated with criminal investigations, such as: interviewing, surveillance, and evidence collection.

4.     In addition to my duties as a criminal investigator, I am also an ATF Certified Fire Investigator (CFI).  As an ATF CFI, I am tasked with providing expert opinions as to the origin and cause of fires.  I obtained the ATF CFI certification in 2009 following a two-year training program that centered on various fire science topics including, but not limited to: chemistry, fire dynamics, and building construction.  The two-year ATF CFI certification program consisted of college courses, written exams, research papers, reading assignments, practical training exercises, and test burns of various materials.  I am re-certified annually as an ATF CFI. To date, I have participated in over 270 fire scene examinations and have testified as an expert.  Additionally, I have been certified as a fire investigator by the International Association of Arson Investigators since June 2011.  I have received over 1,400 class hours of fire related training.  Furthermore, I have been an instructor regarding fire related topics on numerous occasions for the following agencies and institutions: The National Fire Academy (FEMA), International Association of Arson Investigators Chapter 25, Waukesha County Technical College, and Blackhawk Technical College.  I have also participated in over 200 live fire training exercises, where I started training fires and observed fire growth and development. Finally, I was a full-time instructor at the ATF National Academy from August 2015 – August 2016, where I taught several topics during Special Agent Basic Training for new ATF recruits. Specifically, I was a primary instructor for the arson block of training at the ATF Academy.

5.     During the course of my career, I have had trainings regarding the use of social media in relation to criminal investigations.  Specifically, I have received instruction regarding the use of social media sites by criminal elements.  Additionally, I have conducted previous criminal investigations in which internet research that I conducted yielded the use of social media by suspects.  Specifically, I know from my training and experience that alleged suspects

of criminal activity, who have accounts on social media websites, will often communicate their criminal intentions or past activity via "instant message" or "in-box message" on a given social media website. The "instant message" / "in-box message" is a private communication from one user to another. Furthermore, I know through experience that many social media users often use social media websites as their primary means to communicate with others. Additionally, I know from training and experience that suspects who use social media websites sometimes post photographs of themselves possessing incriminating items, such as large amounts of cash, narcotics and firearms. Also, suspects in criminal investigations have been known to post statements on social websites referencing their own criminal activity.

6.      I have previously applied for and received search warrants related to the crime of arson, as well as other crimes.

7.      Information contained in this affidavit was either obtained directly by me or by other investigators who I believe to be truthful and credible. The facts in this affidavit come from personal observations, training and experience, and information obtained from other investigators and witnesses.

8.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

9.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Markquis Lashon Moffett, a.k.a. "Markeisha Moffett," "Rahsheeki Baptiste," has on his Facebook page(s) and in his possession evidence of crimes committed in violation of 18 U.S.C. 844(i) and 18 U.S.C. 844(n). There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## IDENTIFICATION OF ITEMS TO BE SEARCHED

10.     The following Facebook pages:

   a.  Facebook username "Markeisha Moffett" - ID # 100009265014666, herein described as a personal website that is accessed with a username and password specific only to that page and further described in Attachment A. The following Facebook Page URL, Facebook Username, and associated Facebook Identification Number: The applied-for warrant would authorize the search and recovery of evidence particularly described in Attachment B.

   b.  Facebook username "Rahsheeki Baptiste" - ID # 100023601141180, herein described as a personal website that is accessed with a username and password specific only to that page and further described in Attachment A. The following Facebook Page URL, Facebook Username, and associated Facebook Identification Number: The applied-for warrant would authorize the search and recovery of evidence particularly described in Attachment B.

## PROBABLE CAUSE

### Fire at 2537-2541 North Martin Luther King Drive, Milwaukee, WI

11.     On December 6, 2019, at approximately 4:31 a.m., the Milwaukee Fire Department (MFD) responded to a fire at 2537-2541 North Martin Luther King ("MLK") Drive in the City of Milwaukee, Wisconsin. The property was a two-story commercial structure that housed two businesses on the first floor: a Metro PCS cellphone store (assigned address of 2537 North MLK Drive); and Hair Fantasys (sic) salon (assigned address of 2541 North MLK Drive).

12.     Investigators from ATF, the Wisconsin Department of Justice, the Milwaukee Police Department (MPD), and MFD subsequently conducted a joint fire scene examination on

December 6, 2019, to determine the origin and cause of the fire. Based on witness statements, early photographs, and fire pattern analysis, investigators determined the fire originated inside the Hair Fantasys salon. During excavation inside the salon, investigators located a field stone weighing approximately 18 pounds laying on the floor near remnants of a charred duffle bag or backpack that emitted a strong odor consistent with the presence of gasoline. Additionally, investigators located melted red plastic consistent with a gasoline container melted to the remnants of the backpack or duffle bag.

13. ATF and MPD subsequently recovered surveillance video from the following locations in relation to the fire that damaged 2537-2541 North Martin on December 6, 2019:

a) Mobil Gas Station located at 3510 North 7th Street, Milwaukee, WI. The surveillance video was obtained by MPD and inventoried as Item #19043983 under Investigation # 193400018. The surveillance video time stamp was found to be approximately 8 minutes slower than real time.

b) Milwaukee Health Services, Inc. located at 2555 North MLK Drive, Milwaukee, WI. The surveillance video was obtained by ATF and inventoried as Item #12. The surveillance video time stamp was found to be approximately 11 hours 58 minutes faster than the official time according to www.time.gov.

c) Clara Mohammad School located at 317 West Wright Street, Milwaukee, WI. The surveillance video was obtained by ATF and inventoried as Item #6. The surveillance video time stamp was found to be approximately 1 minute faster than the official time according to www.time.gov.

d) BP Gas Station located at 406 West Center Street, Milwaukee, WI. The surveillance video was obtained by ATF and inventoried as Item #19. The surveillance video time stamp was found to be accurate when compared to www.time.gov.

e) All Peoples Church located at 2600 North 2nd Street, Milwaukee, WI. The surveillance video was obtained by ATF and inventoried as Item #17. The

surveillance video time stamp was found to be approximately 50 minutes faster than the official time according to www.time.gov.

    f)   <u>Bouchards</u> clothing store located at 2400 North MLK Drive, Milwaukee, WI. The surveillance video was obtained by ATF and inventoried as Item #18. The surveillance video time stamp was found to be approximately 1 hour 24 minutes faster than the official time according to www.time.gov.

    g)   <u>Northwood Apartments</u> located at 2520 North MLK Drive, Milwaukee, WI. The surveillance video was obtained by ATF and inventoried as Item #13. The surveillance video time stamp was found to be approximately 6 minutes faster than the official time according to www.time.gov.

    h)   <u>Milwaukee County Office on African American Affairs (OAAA)</u> located at 2578 North MLK Drive, Milwaukee, WI. The surveillance video was obtained by ATF and inventoried as Item #15. The surveillance video time stamp was found to be approximately 10 minutes slower than the official time according to www.time.gov.

    i)   <u>Milwaukee Police Department Traffic Camera</u> located on the southwest corner of the intersection of North MLK Drive and Center Street. The surveillance video was obtained by MPD and inventoried as Item #20000203 under Investigation # 193400018. The surveillance video time stamp was found to be accurate.

14.    The following is a summary compilation of relevant images captured by the multiple surveillance systems:

15.    At approximately 3:45 a.m., the Milwaukee Police Department traffic camera mounted on the corner of North Martin Luther King (MLK) Drive and Center Street captured images of a grey or silver four door sedan with a sunroof that traveled southbound on MLK and turned eastbound on Center Street, and then turned southbound on North 2nd Street.

16.    At approximately 3:46 a.m. (adjusted time), camera #5 at Bouchards captured images of a vehicle's headlights that traveled southbound on 2nd Street and appeared to stop near

the intersection of Meinecke Avenue. At approximately 3:48 a.m. (adjusted time), camera #5 captured images of two sets of vehicle headlights that traveled westbound on Meinecke Avenue and then northbound on 2nd Street and stop near the intersection. At approximately 3:49 a.m. (adjusted time), the same camera captured vehicle headlights on 2nd Street, which illuminated at least one person on foot. Within seconds, camera #5 captured two sets of vehicle headlights travel northbound on 2nd Street and out of view. At about that same time, a third vehicle traveled southbound from 2nd Street and turned westbound on Meinecke Avenue and was captured by camera #2 as it drove by the south side of Bouchards.

17. At approximately 3:49 a.m. (adjusted time), the playground camera at Northwood Apartments captured images of an SUV that traveled northbound on 2nd Street and then turned westbound on Wright Street. Approximately 10 seconds later, the same camera captured images of a vehicle that also traveled northbound on 2nd Street and westbound on Wright Street.

18. At approximately 3:51 a.m., an MPD traffic camera mounted on the corner of North MLK Drive and Center Street captured images of a grey or silver four door sedan with a sunroof that traveled northbound on MLK Drive and continued north through the intersection.

19. At approximately 3:57 a.m., an MPD traffic camera mounted on the corner of North MLK Drive and Center Street captured images of a grey or silver four door sedan with a sunroof that traveled southbound on MLK Drive through the intersection. The vehicle appeared to be similar to the vehicle that was headed northbound about six minutes earlier.

20. At approximately 3:59 a.m. (adjusted time), Bouchards' camera #4 captured images of a car that traveled southbound on MLK Drive and turned eastbound on Meinecke Avenue. The images of that car were similar to those of the car that had traveled northbound on MLK Drive from Meinecke Avenue at approximately 3:50 a.m. (adjusted time). At

approximately 3:59 a.m., the car (with the sunroof) turned eastbound on Meinecke Avenue and was followed by a car that had been eastbound on Meinecke Avenue (west of MLK Drive).

21. The two vehicles were subsequently observed on camera #5 travel eastbound through the 2nd Street intersection and both vehicles appeared to have turned northbound in the alley located between 1st and 2nd Streets.

22. At approximately 4:00 a.m. (adjusted time), the Playground camera at Northwood Apartments captured images of two sets of vehicle headlights that traveled northbound in the alley between 1st and 2nd Streets from south of Wright and crossed over Wright Street into the alley north of Wright Street. At approximately 4:01 a.m. (adjusted time), the Playground camera captured images of one vehicle that traveled southbound on 1st Street and turned eastbound on Wright Street. Investigators examined the surveillance video footage at All Peoples Church located at 2600 North 2nd Street for this time frame and did not observe any vehicle exit the alley between 1st and 2nd Street northbound. However, a vehicle was observed traveling northbound on 1st Street and continued north through the intersection of 1st Street and Clark. Your affiant later examined the alley located between 1st and 2nd Streets and found an open lot area immediately south of 2547 South 1st Street that showed signs of tire tracks from the alley to 1st Street. This open area was the only access point for vehicles to travel between the alley and 1st Street. Therefore, it is reasonable to conclude the two vehicles captured traveling northbound in the alley from Wright Street on the Playground camera subsequently traveled east through the open lot, with one vehicle subsequently turning south on 1st Street while the other turned north.

23. At approximately 4:05 a.m. (adjusted time), Bouchards' camera #5 captured headlights of a vehicle that traveled westbound on Meinecke Avenue and then northbound on 2nd Street.

24.     At approximately 4:05 a.m. (adjusted time), the Playground camera at Northwood Apartments captured images of a car that traveled slowly northbound on 2nd Street and crossed over Wright Street and out of frame.

25.     At approximately 4:06 a.m. (adjusted time), the surveillance camera at All Peoples Church captured images of vehicle headlights that illuminated the south exterior wall of the church in a manner consistent with a vehicle turning eastbound on Clark Street from northbound 2nd Street.  Moments later a vehicle appeared traveling eastbound on Clark Street. The vehicle then turned southbound on 1st Street.

26.     At approximately 4:16 a.m. (adjusted time), the Playground camera at Northwood Apartments captured images of at least one person walking southbound on the east side of 2nd Street.

27.     The Playground camera then captured two individuals walk westbound at approximately 4:17 a.m. (adjusted time) on the north sidewalk of Wright Street.  One of the individuals appeared to be carrying a bag with a strap over his/her shoulder.

28.     At approximately 4:19  a.m. (adjusted time), camera #2 at Clara Mohammad School captured two subjects walk westbound on Wright Street and cross MLK Drive.

29.     The first subject (Subject #1) wore a light colored hooded sweatshirt with colored pants. Subject #1 carried a shoulder strapped bag on his/her right shoulder which he/she readjusted several times throughout the videos. The second subject (Subject #2) wore a dark hooded sweatshirt and dark pants. During the footage captured by camera #2 at the Clara Mohammad School, a light-colored object can be seen under Subject #2's right arm and held close to their body.

30. At approximately 4:20 a.m. (adjusted time), the two subjects walked northbound from Wright Street down the alley running parallel between Vel R. Phillips Avenue and MLK Drive on camera #1 at Clara Mohammad School. Subject #1 continued to hold the shoulder bag on his/her right shoulder while Subject #2 carried the light-colored object in his/her left hand.

31. At approximately 4:21 a.m. (adjusted time), camera #2 at Northwood Apartments captured at least one person walk northbound in the alley behind 2537-2541 North MLK Drive.

32. At approximately 4:22 a.m. (adjusted time), the Clara Mohammad School camera captured Subject #2 walk eastbound near 2537-2541 North MLK Drive while Subject #1 continued to walk northbound down the alley.

33. At approximately 4:23 a.m., camera #D23 at Milwaukee Health Services captured Subject #1 walking north through the alley west of Milwaukee Health Services.

34. At approximately 4:24 a.m. (adjusted time), camera #D21 captured Subject #1 walk north through the alley towards Clark Street. It appeared that Subject #1 was wearing a dark-colored material over his/her face.

35. At approximately 4:24 a.m. (adjusted time), camera #D27 captured Subject #1 turn eastbound on Clark Street.

36. Also at approximately 4:24 a.m. (adjusted time), camera #D1 captured Subject #1 walk eastbound on Clark Street and turn southbound MLK Drive.

37. At approximately 4:25 a.m. (adjusted time), camera #D28 captured Subject #1 walk southbound on MLK Drive and stop approximately 2-3 times while walking southbound in order to look behind him/her. Camera #D28 also captured Subject #1 stop south of 2537 North MLK Drive and disappear west off camera.

38. At approximately 4:26 a.m. (adjusted time), the West Side camera at Northwood Apartments captured images of a person who walked southbound on the sidewalk in front of 2537-2541 North MLK Drive and then west (up the stairs) and along the south wall of 2537-2541 North MLK Drive.

39. At approximately 4:27 a.m. (adjusted time), the West Side camera at Northwood Apartments captured images of two people who walked east along the south wall of 2537-2541 North MLK Drive and then down the stairs and northbound on the sidewalk out of view.

40. Camera #D28 at Milwaukee Health Services the captured both subjects walk north on the sidewalk and disappear into a doorway until a Milwaukee County Bus passed. Subject #2 subsequently threw an object into 2537-2541 North MLK Drive. Subject #2 then immediately traveled east across MLK Drive. As Subject #2 crossed the street, Subject #1 put his/her shoulder bag on the ground and lit it on fire. Once the bag was burning, Subject #1 threw the bag into 2537-2541 N. MLK Drive. Both subjects continued east through the vacant lot directly east of 2537-2541 North MLK Drive.

41. At approximately 4:30 a.m. (adjusted time), camera #D24 at Milwaukee Health Services captured both subjects travel on foot north through the alley located between MLK Drive and 2nd Street. Both subjects then turned eastbound through the vacant lot to the south of 2563 North 2nd Street.

42. At approximately 4:31 a.m. (adjusted time), the surveillance camera at All Peoples Church captured images of vehicle headlights illuminate the east side of 1st Street and move from south to north. Moments later, a vehicle traveled northbound on 1st Street through the Clark Street intersection and disappeared out of frame.

43.     Also at approximately 4:31 a.m. (adjusted time), the Clark Street fishbowl camera at Milwaukee Health Services captured an SUV consistent with the SUV observed at approximately 3:50 a.m. travel eastbound on Clark and then northbound on MLK Drive.

44.     Based on the totality of the information available, this fire was classified as incendiary.

### Statement of Hair Fantasys Salon Owner

45.     Sheena King was the owner of Hair Fantasys salon at the time of the fire and was interviewed by ATF on December 6, 2019.  King stated she had dinner with a friend at King Crab Shack on Brady Street sometime between approximately 5:00 p.m. – 6:00 p.m. on December 5, 2019.  Near the end of her dinner at King Crab Shack, Sheena King stated a black male she knows as Markquis Moffett walked into the restaurant and she attempted to say hello to him but he ignored her.  King said she and Moffett used to get along years ago but their relationship soured when King no longer allowed him to frequent her hair salon.  King said she attempted to say hello to Moffett a second time and cracked a joke about a time when Moffett was hit by several paintballs on the street.  King stated that Moffett became extremely angry and stated that he did not "fuck with" her so she should not "fuck with" him.  King said she tried to reassure Moffett that she was only joking and had not seen him in several years.  King further stated that Moffett would not settle down and even pulled mace out of his pocket and threatened to spray King and her friend with mace.  King said she and her friend paid for their meals and left the restaurant while Moffett was still agitated.  King stated Moffett was by himself when she saw him at the restaurant.

46.     The above mentioned altercation between Moffett and King was later observed and confirmed by ATF via surveillance video at the King Crab Shack. The black male King

identified as Markquis Moffett was observed on the King Crab Shack surveillance video and matched the likeness of Markquis Lashon Moffett, also known as, "Markeisha Moffett," and "Rahsheeki Baptiste," according to booking photographs from the Milwaukee Police Department.

47.     King later provided two screen shots of two Facebook pages for Markquis Moffett. King stated that Moffett also goes by the names Markeisha Moffett and Rahsheeki Baptiste. King also said Moffett self-identifies as a female.

48.     On December 6, 2019, King provided ATF with a Facebook video that had been sent to her from a number she did not know. The Facebook video was posted by Markquis Moffett and in the video Moffett celebrated the fire at Hair Fantasys. The video included icons at the bottom of the screen consistent with a Facebook video. The following is a summary of the comments made by Moffett on the Facebook video:

> Who…set that bitch shit on fire…feliz navidad, I want to wish you a Merry Christmas. Aha, bitch…Somebody got that bitch a gift – hey Reedy, hey Cousin…I pledge allegiance to make these bitches madder and madder and madder… aha bitch…that's what you get, bitch…that's exactly what that bitch get, that bitch was picking with me up in mother fucking Crab Shack yesterday…that's what she get, bitch…please, bitch, I hope you watching this live…why you all laughing at me…

49.     On December 6, 2019, King also provided Agent Hankins with an Instagram video that had been sent to her from a number she did not know. The Instagram video was posted by Marquis Moffett and in the video Moffett described his confrontation with Sheena King at King Crab Shack on December 5, 2019. During the video, Moffett stated he has been asked why he posts about confrontations on Instagram. The video includes icons at the bottom of the screen consistent with an Instagram video. The account on the video screen is

"doo_doo_hoes_". The following is a summary of the comments made by Moffett on the Instagram video:

> …when I was sitting there waiting for her [at King Crab Shack] to come, I'm getting into it with…Sheena King for no reason…bitch you been harassing me since I was a kid…you fucking with my broke ass, don't you own a shop? I'll have Fox 6 news on your ass, bitch…you did all that in public…and you own a business…you mad cause my friend Vashti fucking your man. That's why you picking on me cause my friend Vashti fucking your man still…Leave me alone Sheena King cause I'll get your business shut down. You just did all that shit in front of Crab Shack…You mad cause my friend Vashti still fucking your man, Sheena? Sucks to be you… people always be picking on me…taunting me…

50.     A review of publicly available Facebook posts by Markquis Moffett on his "Rahsheeki Baptiste" account page showed he is Facebook friends with an individual he referred to as a "cousin" with a profile name of "Gregory Moffett".

**Gregory Moffett Cellphone Records**

51.     ATF conducted an open source search for Gregory Moffett and located a cellphone number of (414) 514-8462. On January 29, 2020, ATF Agent Hankins placed a ruse phone call to (414) 514-8462 posing as a telemarketer. A male answered the call and identified himself as Greg Moffett.

52.     Sheena King later identified Markquis Moffett's cellphone number as (414) 998-5476.

53.     ATF later received call detail records from Sprint for number (414) 514-8462. The records showed that Gregory Moffett's cellphone had 12 contacts with (414) 998-5476 between 8:08 p.m. on December 5, 2019, and 1:25 a.m. on December 6, 2019.

## FACEBOOK INFORMATION

54.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

55.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

56.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

57.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook

users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

58.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

59.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

60.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on

Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

61. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

62. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

63. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

64. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

65. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

66.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

67.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

68.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

69.     Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

70.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member,

including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

71.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

72.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

73.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained

by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

74. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning

subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND ITEMS TO BE SEIZED

75. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

76. Based on the forgoing, I request that the Court issue the proposed search warrant. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court of the Eastern District of Wisconsin is a district court of the United States that has jurisdiction over the offense(s) being investigated, 18 U.S.C. § 2711(3)(A)(i). Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

# ATTACHMENT A

*Property to Be Searched*

This warrant applies to information between December 5, 2019 and the present date associated with the Facebook accounts

a. Facebook username "Markeisha Moffett" - ID # 100009265014666, herein described as a personal website that is accessed with a username and password specific only to that page and further described in Attachment A. The following Facebook Page URL, Facebook Username, and associated Facebook Identification Number: The applied-for warrant would authorize the search and recovery of evidence particularly described in Attachment B.

b. Facebook username "Rahsheeki Baptiste" - ID # 100023601141180, herein described as a personal website that is accessed with a username and password specific only to that page and further described in Attachment A. The following Facebook Page URL, Facebook Username, and associated Facebook Identification Number: The applied-for warrant would authorize the search and recovery of evidence particularly described in Attachment B.

**ATTACHMENT B**
**Particular Things to be Seized**

**Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

a. All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

b. All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

c. All photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them;

d. All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

e. All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

f. All "check ins" and other location information;

g. All IP logs, including all records of the IP addresses that logged into the account;

h. All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

i. All information about the Facebook pages that the account is or was a "fan" of;

j. All past and present lists of friends created by the account;

k. All records of Facebook searches performed by the account;

l. All audio messages sent by the account and messages received by the account;

m. All video messages sent by the account and to the account;

n. Any and all location data that is recorded by Facebook related to the account

o. All information about the user's access and use of Facebook Marketplace;

p. The types of service utilized by the user;

q. The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

r. All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

s. All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

**Information to be seized by the government**

All information described above that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. §§ 844(i) and 18 U.S.C. 844(n), since December 5, 2019 to the Present, for each user ID identified on Attachment A, including information pertaining to the following matters:

a.  The relevant offense conduct, any preparatory steps taken in furtherance of the scheme, communications between the suspect and others related to the relevant offense conduct in the above-listed crimes;

b.  Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

c.  Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

d.  The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

e.  The identity of the person(s) who communicated with the user ID about matters relating to relevant offense conduct of the above-listed crimes, including records that help reveal their whereabouts.

f.  Based on the forgoing, I request that the Court issue the proposed search warrant based on the aforementioned facts.